PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee, v. MARGARET C. LAWNSDAIL, Appellant.

No. 46498.

October 17, 1944.

Gamble, Read, Howland & Rosenfeld, of Des Moines, for appellant.

Henry & Henry, of Des Moines, for appellee.

OLIVER, J.—Margaret C. Lawnsdail, appellant, was beneficiary in a $1,200 policy insuring the life of her husband, Orville F. Lawnsdail, issued August 1, 1940, by appellee, Prudential Insurance Company of America. The policy provided for double indemnity for accidental death. It was issued without medical examination. Premiums were payable quarterly.

June 23, 1941, Mr. Lawnsdail was accidentally drowned while fishing. September 19, 1941, appellee refused payment of said policy and in July 1942 brought this action to cancel the same, alleging it was procured by false statements in the application with reference to prior illnesses, hospital confinement, and medical treatment. The answer was a general denial, coupled with allegations that plaintiff's agent prepared the application, procured the signature of Mr. Lawnsdail thereto, and thereafter inserted therein the statements in question upon his own information, without being in any way deceived by any statements of Mr. Lawnsdail. Appellant by counterclaim sought to recover upon the policy.

Appellant practically concedes that various answers to material inquiries in the application were false and if made by Lawnsdail were knowingly false. For several years Lawnsdail had suffered from fainting spells or epilepsy and had been treated by various doctors and in several hospitals. The prin-

cipal issue of fact is whether the false answers were made by Lawnsdail or by appellee's agent, entirely on his own motion and without directing the inquiry to Lawnsdail.

The application was in two parts, upon separate sheets of paper, each to be signed by the applicant. The questions in part 1 called for the applicant's name, age, occupation, other insurance, description of the policy, and the beneficiary. This part of the application is here involved only incidentally. Part 2 of the application contained the questions concerning the applicant's habits, size and weight, family history, and medical and health history. The questions and false answers in controversy in this case were in this part of the application.

Orville Lawnsdail was by occupation a baker. He had carried policies with appellee, issued in 1926, 1930, 1932, and 1935, and in 1940 had policies upon which premiums were payable weekly. He was twenty-five years of age.

John Hanson was assistant superintendent of appellee's Des Moines agency. He had known Orville Lawnsdail since the latter was a boy of twelve, and during the intervening years had frequently collected insurance premiums from Lawnsdail. Lawnsdail was formerly an athlete and Hanson had many times watched him play football. Hanson testified that in 1940 Lawnsdail was a big, husky-looking chap, who appeared to be in perfect condition, and that he knew Lawnsdail did not drink. It is evident that, based upon his long acquaintance with Lawnsdail, the latter's insurance record as known to Hanson, and Lawnsdail's appearance, Hanson considered him a good insurance risk.

Lawnsdail lived in West Des Moines. On July 15, 1940, the regular agent for that territory was absent and Hanson was handling his premium collections. In the course of this work he called at the Lawnsdail home. The husband and wife were present.

After making the collection Hanson said, "Orville, I think it is time you should carry more insurance * * *." The Lawnsdails hesitated, doubting that they could afford it. However, after some persuasion by Hanson they said they would take another policy. Hanson took out his papers, started questioning

Lawnsdail, and wrote the answers on the papers. Lawnsdail sat across the table. The questions contained in part 1 were asked and the answers were placed therein by Hanson. Hanson also wrote Lawnsdail's answers to questions concerning Lawnsdail's weight and physical measurements, and the ages, etc. of his parents, brothers, and sisters. It may be here noted that these questions were contained in part 2 of the application. Hanson testified none of the other questions in part 2 was asked by him at that time.

Mrs. Lawnsdail testified that after a few minutes of questioning Hanson said: "Now, Orville, we won't ask you these questions because I feel that I know you well enough, having known you long enough, that I can answer these questions, myself, and we won't take the time because * * * I am in a hurry * * * Here, Orville, you can just sign your name here," and Orville signed.

She testified that she was unable to say how many times Lawnsdail signed the papers; that Hanson said the policy would be delivered to them later; that he said nothing about not having any papers he needed to complete the application or that he would return later; that as far as she knew Hanson did not return later. She also testified that when the policy was received it was filed with other policies and was not opened or examined.

Part 1 of the application signed by Lawnsdail was dated July 15, 1940. Part 2 was likewise dated July 15, 1940. Appellant contends parts 1 and 2 were signed by Lawnsdail at the same time; that the only answers then in part 2 were those giving Lawnsdail's weight and measurements and the ages, etc. of members of his family, and that thereafter Hanson, on his own motion, inserted answers to the other questions.

Hanson testified part 2 was made the following day. He testified he did not have part 2 of the application with him on July 15th, that it was in his automobile which was parked several blocks distant from the Lawnsdail home; that he told the Lawnsdails he did not have the other form and would call later and have it signed; that the next evening he drove out to the Lawnsdail home and met Mr. Lawnsdail alone in front of the

house and that Hanson filled out and Lawnsdail signed part 2 on the hood of Hanson's car.

Appellee argues that Lawnsdail's signature on part 2 indicates it was made on the curved hood of the automobile and thus corroborates Hanson's story. We are unable to agree that there is sufficient variation in Lawnsdail's signatures in parts 1 and 2 to be of much significance. Signatures of Lawnsdail upon other exhibits are by no means uniform. Furthermore, there is a marked symmetry in the answers printed by Hanson in part 2, which would indicate they were written upon a smooth, level surface, such as a table, rather than on the curved hood of an automobile.

The evidence indicates Hanson was pressed for time when he took the application on July 15th. Under such circumstances it would seem improbable that, if he did not have part 2 with him and expected to return later to fill it out and secure Lawnsdail's signature, he would take the time to ask some questions and write some answers required by part 2. Hanson gave no reason for so doing. He testified he noted these questions and answers on, "Why it would be just on a little piece of paper, or on a page, maybe, of the collection book."

An examination of part 2 discloses that these particular questions, 9A and 21C, required specific statements of the ages, etc. of certain members of Lawnsdail's family, his weight and measurements, and that (except for the question "How long have you lived in the city?" and the answer "all his life.") every other question in part 2 was answered either by "yes," "no," or "none." Anyone could have filled in all the "yes," "no," and "none" answers, which would give the applicant a clean bill of health, as was done in this case. And Hanson felt certain Lawnsdail had been and was in excellent health.

As already noted, Mrs. Lawnsdail testified Hanson said, "We won't ask you these questions * * * I know you well enough * * * that I can answer these questions, myself * * * I am in a hurry * * * just sign your name here." Hanson made it a point to secure answers to all the questions in part 2 which contained specific figures (and those answers only), thus placing himself in a position to complete part 2. That he did secure

these answers, for no other apparent reason, is a circumstance which fits and tends to corroborate Mrs. Lawnsdail's testimony.

Mrs. Lawnsdail's mother testified Hanson told her: "* * * I knew Orville all his life since he was a little boy, and he always appeared so healthy and strong I never thought there was anything wrong with him, so when I came up to check, to write out the application, I just made short [work] of it." Hanson testified, to his knowledge he did not remember having told the witness he made short work of the application.

Appellee kept in its Des Moines office a card record of the policy which apparently showed, among other things, the date when the application was forwarded to the home office. This record contained evidence material to the controversy. If it showed the application was sent July 16th, this would have tended to discredit Hanson's testimony that such application was not completed until the evening of that day. Appellee destroyed this record. Hanson testified this was done six months after Lawnsdail's death, in accordance with a general practice of the agency. This explanation is not satisfactory. Appellee had refused payment on the policy and presumably was prepared to litigate the question of its liability three months before this. Apparently this was the only record which would show the history of the application and policy. The destruction of the record by appellee under such circumstances authorizes an inference which tends to corroborate the evidence adduced by appellant. Warren v. Crew, 22 Iowa 315, 322; Straight v. American Life Ins. Co., 184 Iowa 301, 306, 168 N. W. 84.

The foregoing discussion of the evidence has been limited to some of the most important matters. A careful study of the entire record satisfies us it clearly shows that the misstatements in question were made by appellee's agent entirely on his own motion and without directing the inquiry to Lawnsdail. It is well settled that when the misstatements are so made by its agent, their falsity may not be set up by the insurance company to avoid the policy even though it would not have issued the policy had truthful statements been made. Roe v. National Life Ins. Assn., 137 Iowa 696, 115 N. W. 500, 17 L. R. A., N. S., 1144; Den Hartog v. Home Mutual Ins. Assn., 197 Iowa 143, 147, 196

N. W. 944; 29 Am. Jur. 641. Hence the decree and judgment of the trial court canceling the policy and dismissing appellant's counterclaim were erroneous.

This conclusion renders unnecessary the determination of various other legal propositions presented by the parties.

The decree and judgment are reversed and the cause is remanded to the trial court for judgment for appellant on her counterclaim.—Reversed and remanded.

All JUSTICES concur.