**ST. PAUL REINSURANCE COMPANY, LTD., CNA Reinsurance Company, Ltd., and Zurich Reinsurance (London) Limited, Plaintiffs,**

v.

**COMMERCIAL FINANCIAL CORP., Defendant,**

**Commercial Financial Corp. and Security State Bank, Counterclaim Plaintiffs,**

v.

**St. Paul Reinsurance Company, Ltd., CNA Reinsurance Company, Ltd., Zurich Reinsurance (London) Limited, Professional Claims Managers, Inc., and U.S. Risk Underwriters, Inc., Counterclaim Defendants.**

**No. C00–4080 MWB.**

United States District Court, N.D. Iowa, Western Division.

May 4, 2001.

MEMORANDUM OPINION AND
ORDER REGARDING TRIAL
ON THE MERITS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1060
 A. *Motion To Amend The Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1061
 1. *The parties' arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1061
 2. *Rule 15(b)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1062
 3. *Rule 15(a)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1067
 B. *Findings of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1068

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1072
 A. *IBIS's Role* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1073
 1. *What is a "soliciting agent" under Iowa law?* . . . . . . . . . . . . . . . . . . .1073
 2. *Is IBIS a "soliciting agent"?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1075
 3. *Applicability of IOWA CODE § 515.123* . . . . . . . . . . . . . . . . . . . . . . . .1077

 4. *Effect of the applicability of IOWA CODE § 515.123* .................. 1080
 5. *IBIS's knowledge* ............................................ 1082
 B. *Fraud Claim* ................................................ 1083

**III. CONCLUSION** .................................................. 1084

## I. INTRODUCTION

This lawsuit began on July 24, 2000, with the plaintiff insurers' filing of an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the purpose of construing the rights and legal relations of the parties arising from a contract of insurance entered into between St. Paul Reinsurance Company, Ltd., CNA Reinsurance Company, Ltd., and Zurich Reinsurance (London) Limited (hereinafter referred to as the "London Insurers") and Commercial Financial Corporation ("CFC"). In their declaratory judgment action, the London Insurers seek rescission of a contract for employment practices liability insurance between CFC and U.S. Risk Underwriters, Inc. ("U.S.Risk") based upon what the London Insurers allege were material misrepresentations by CFC in the process of applying for insurance coverage. Specifically, the London Insurers allege that CFC failed to disclose that in October of 1999 it had terminated three employees of Security State Bank ("SSB"), a bank CFC had recently acquired, as CFC should have done in connection with its February 9, 2000, request that SSB be added to an existing employment practices liability insurance policy. The London Insurers contend that CFC failed to make the disclosure of the terminations despite knowing that such information was material to the risk that the London Insurers assumed in issuing an employment practices liability insurance policy. The London Insurers, therefore, contend that CFC's failure to disclose such material information constituted fraud. CFC responded on September 5, 2000, with its Answer, Counterclaim, and Third–Party Complaint, in which it asserts, *inter alia,* that the London Insurers acted in bad faith in denying CFC's claim against the employment practices liability insurance policy for coverage of the employment discrimination claims by the employees terminated from SSB in October of 1999.

Originally, a bench trial in this case was scheduled to commence on February 2, 2001. However, on January 19, 2001, the parties filed a joint stipulation indicating that this matter could be properly tried by submitting briefs and a written record to the court in lieu of a bench trial, and, thus, agreed to try this matter on the written record. Pursuant to this stipulation, the court agreed that this matter would, indeed, be tried on the written record and, further, agreed with the parties that the deadline for submitting initial trial briefs would be February 20, 2001, and any resistance or reply to the opposing party's brief would be due by March 5, 2001. The matter was to be deemed fully submitted on March 5, 2001.

On February 20, 2001, both parties submitted their trial briefs, and likewise, on March 5, 2001, both parties submitted their reply briefs to the opposing party's trial brief. The London Insurers, however, contemporaneously filed a Motion to Amend Complaint to Conform to Evidence pursuant to Federal Rule of Civil Procedure 15(b) along with their reply brief. The London Insurers contend that paragraph 29 of their Complaint incorrectly alleges that Iowa Bankers Insurance & Services, Inc. ("IBIS") was aware of the involuntary terminations that are the subject of this action. Therefore, the London Insurers ask the court to grant them leave to file an Amended Complaint that conforms to the evidence regarding the fact that IBIS was not aware of the October

terminations so that this matter may be decided on its merits and not on a technicality. CFC vehemently opposes the London Insurers' motion, asserting sundry reasons in support of its opposition. Therefore, before turning to the merits of this case, the court must rule upon the London Insurers' Motion to Amend Complaint to Conform to the Evidence.

### A. Motion To Amend The Complaint

Initially, the court notes that the basis of the London Insurers' claim for rescission is fraud, which is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[1] The Eighth Circuit Court of Appeals has stated that a party pleading fraud is "limited to the specific allegations pleaded in [its] complaint." *McAnally v. Gildersleeve*, 16 F.3d 1493, 1496 (8th Cir.1994) (citing Rule 9(b) and *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir.1985)). This is so, because "the primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Novak v. Kasaks*, 216 F.3d 300, 314 (2nd Cir.2000) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2nd Cir.1990)). In this case, from July 24, 2000, to March 5, 2001, the London Insurers alleged that, as of February 9, 2000, IBIS was "well aware" of the October terminations. Specifically, in paragraph 29 of their Complaint, the London Insurers allege the following:

As of February 9, 2000, however, CFC and Iowa Bankers were both well aware of:

a. the October Terminations

b. the importance and materiality of such involuntary terminations to the underwriting on the renewal of the terminations; and

c. the serious potential that the terminated individuals would bring suit against CFC, triggering coverage under the Subject Policy.

Plaintiffs' Complaint at ¶ 29.[2] Presently, however, the London Insurers contend that IBIS was not "well aware" of the October terminations as of February 9, 2000, based on the deposition testimony of Ken Richards. Therefore, the London Insurers now ask this court permission for leave to amend a factual allegation in their Complaint upon which their fraud claim is based at this, the eleventh hour—that is, at the close of discovery, after the parties have submitted their trial briefs, and after stipulating that the merits of this case would be tried on the written record. It is within this context that the court turns to the London Insurers' motion to amend pursuant to Rule 15(b).

### 1. The parties' arguments

The London Insurers contend that the allegations contained in paragraph 29 of the Complaint were made upon information and belief before discovery was conducted and before the facts underlying this

---

1. This court has discussed at length the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) in several reported decisions. *See, e.g., Doe v. Hartz*, 52 F.Supp.2d 1027, 1055 (N.D.Iowa 1999) (elements and pleading); *Brown v. North Cent. F.S., Inc.*, 987 F.Supp. 1150, 1155–57 (N.D.Iowa 1997) (pleading); *Brown v. North Cent. F.S., Inc.*, 173 F.R.D. 658, 664–65 (N.D.Iowa 1997) (pleading); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 827 (N.D.Iowa 1997) (elements); *North Cent. F.S.,*

*Inc. v. Brown*, 951 F.Supp. 1383, 1407–08 (N.D.Iowa 1996) (pleading); *Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F.Supp. 1445, 1469 (N.D.Iowa 1996) (elements of fraud and fraudulent non-disclosure); *DeWit v. Firstar Corp.*, 879 F.Supp. 947, 970 (N.D.Iowa 1995) (elements and pleading).

2. Iowa Bankers is short for Iowa Bankers Insurance & Services, Inc., which this court refers to as "IBIS."

dispute were fully known. During the course of discovery, however, the London Insurers contend that IBIS denied that it was ever told of the involuntary terminations giving rise to the present suit. Specifically, the London Insurers claim that it was not until the deposition of IBIS's vice president who handled CFC's account, Ken Richards, during which he repeatedly denied that CFC ever notified him of the involuntary terminations before coverage for SSB was issued, that they became aware that IBIS was not aware of the involuntary terminations. In light of Mr. Richard's testimony, the London Insurers ask that paragraph 29 of their Complaint, alleging that IBIS was aware of the October terminations, be amended so as to conform to the evidence pursuant to Federal Rule of Civil Procedure 15(b). The London Insurers argue that the parties consented to amendment of the Complaint both impliedly and explicitly. Specifically, the London Insurers contend that the parties explicitly consented to amendment of the Complaint by stipulating to admission into evidence of Ken Richards's deposition transcript, including testimony where he denies ever being informed of SSB's involuntary terminations by CFC or SSB. The London Insurers point out that Ken Richards's testimony is in direct contravention to the testimony of CFC and SSB's officers, and also at odds with paragraph 29 of their Complaint. Moreover, the London Insurers contend that CFC impliedly consented to amendment of the Complaint because CFC raises the factual issue of notice to IBIS in its trial brief. Thus, in failing to object, and by stipulating such testimony into evidence, the London Insurers contend that they are entitled to amend their Complaint, and further that CFC has waived its right to argue that the admission in paragraph 29 of their Complaint is binding.

In response, CFC argues that the London Insurers' motion must be denied because of the following reasons: (1) it is untimely; (2) the London Insurers fail to proffer any justification for their delay in requesting leave to amend; and (3) allowing the London Insurers to amend after discovery is complete and after the parties agreed to submit this matter on the written record would be improper and prejudicial. Additionally, CFC contends that the London Insurers should not be allowed to amend their Complaint because the London Insurers may not erase their admission and may not assert something that they do not believe. Further, CFC argues that it has not waived its right to argue that the admission in paragraph 29 of the London Insurers' Complaint is binding.

### 2. *Rule 15(b)*

Federal Rule of Civil Procedure 15(b) provides as follows:

(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

FED.R.CIV.P. 15(b). The United States Court of Appeals for the Eighth Circuit has explained:

> Amendments are allowed when the parties have had actual notice of an unpleaded issue and have been given an adequate opportunity to cure any surprise resulting from the change in the pleadings. And, when evidence relating to issues outside the pleadings is introduced and tried without objection, the parties will be deemed to have acquiesced. *Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 275 (8th Cir.1978) (citations omitted).

*Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir.1997); *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir.1990).

As indicated, Federal Rule of Civil Procedure 15(b) provides for amendments of pleadings to conform to the evidence "when issues not raised by the pleadings are tried by express or implied consent of the parties...." The court, therefore, finds that Rule 15(b) is not applicable here, because the London Insurers unambiguously pled, and CFC admitted, that, as of February 9, 2000, IBIS was well aware of the October terminations. *See Lucas v. Burnley*, 879 F.2d 1240, 1243 (4th Cir. 1989) ("the plain language of 15(b), which speaks of 'issues not raised by the pleadings,' precludes the rule's application in this case. The certificate requirement was not only raised by the pleadings, it was admitted and therefore resolved by those pleadings...."); *Wirtz v. Savannah Bank & Trust Co. of Savannah*, 362 F.2d 857, 861 (5th Cir.1966) ("Rule 15(b), however, by its own terms is not applicable here since the matter was raised by the Secretary's Complaint and admitted by the Bank."). Moreover, as will be demonstrated, the question of whether or not IBIS, as of February 9, 2000, was aware of the October terminations was not litigated by the parties "by express or implied consent."

It must be remembered that from July 24, 2000, to March 5, 2001, the London Insurers have maintained that as of February 9, 2000, IBIS was "well aware" of the October terminations. It was not until the deposition of Ken Richards that the London Insurers claim that they became aware that this allegation was apparently untrue. Thus, the question becomes whether, under Rule 15(b), CFC has "tried" the validity of the London Insurers' pleading regarding IBIS's knowledge of the October terminations merely by asking about that pleading in a discovery proceeding. This question was squarely presented and answered by the Eighth Circuit Court of Appeals in *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir.1990). In that case, the Eighth Circuit Court of Appeals held that discovery inquiries regarding a matter admitted in a pleading "do not amount to 'implied consent' to the amendment" of the pleading. *Id.* at 1315–16. Moreover, the Eighth Circuit Court of Appeals went on to explain that "[a]s a rule, the existence of implied consent seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial." *Id.* Ultimately, the Eighth Circuit Court of Appeals concluded that the parties did not believe that the issue had "entered the case," because the parties did not address the validity of the pleading in their summary judgment motions. *Id.*

In this case, not only did the London Insurers allege that IBIS was "well aware" of the October terminations as of February 9, 2000, in their Complaint, but CFC admitted this fact in its Answer. CFC clearly did not believe that the validity of this pleading had entered the case, because, despite making reference to Ken Richards's testimony as to whether he

knew about the terminations in its trial brief, CFC does so in a footnote, and assumes that "Mr. Richards' confusion and vacillation regarding his knowledge are irrelevant because the Insurers allege, and CFC admits, that Mr. Richards knew of the terminations at issue. Complaint at ¶ 29." *See* CFC's Brief at 5 n. 1. Thus, the court finds that CFC obviously did not believe that the validity of IBIS's knowledge regarding the October terminations had entered the case, because CFC relied on paragraph 29 of the Complaint to disregard Ken Richards's testimony. Furthermore, after Ken Richards's deposition testimony, Mr. Schwartz, the London Insurers' own investigator, testified that Ken Richards was aware of the October terminations as of February 9, 2000. The following colloquy between CFC's counsel and Mr. Schwartz during Mr. Schwartz's deposition is illuminating:

Q. What is Deposition Exhibit 11?

A. It appears to be the complaint that was filed on behalf of St. Paul Re, CNA Re and Zurich Re against Commercial Financial Corporation?

Q. And that's the complaint you reviewed for accuracy, is that right, Mr. Schwartz?

A. Yes, it is.

Q. And you reviewed it for accuracy based on your investigation of the facts in this matter, correct, Mr. Schwartz?

A. My investigation of the facts and the law.

Q. Can you look at Paragraph 29 of the complaint, please, Mr. Schwartz.

A. Yes.

Q. Do you see that you say, As of February 9, 2000, however, CFC and Iowa Bankers were both well aware of the October terminations?

A. Okay.

Q. Any you allege that to be true; correct?

A. Yes.

Q. Any you believed it to be true based on your obligations under Rule 11; correct?

A. Correct. I believe that to be true based on my conversations with Mr. Brown and Ken Richards.

Q. *And Mr. Richards—in fact, you told me Mr. Richards admitted to you that he knew about those terminations, didn't you?*

A. *That's correct.*

Schwartz Dep. at p. 168–69 (App.470). Also, Mr. Schwartz testified that he reviewed the Complaint on behalf of the London Insurers and that all of the allegations contained therein, including paragraph 29, were correct and that he had not changed his mind about any of those allegations. *Id.* at 166. Therefore, based on this testimony, which occurred after Ken Richards's testimony, it was reasonable for CFC to believe that the validity of IBIS's knowledge regarding the October terminations was not in dispute, and, thus, had not entered the case. *See Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir.1995) (stating that an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried) (citing *Gamma–10 Plastics v. American President Lines, Ltd.*, 32 F.3d 1244, 1256 (8th Cir.1994), *cert. denied*, 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995)); *see also Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 332 (5th Cir.1994) (if evidence of a pleaded issue and an unpleaded issue overlap, there is no implied consent absent a clear indication that the party using the evidence is attempting to raise a new issue); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 814 (9th Cir.1994) (same); *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir.1992) (evi-

dence that is relevant to a pleaded issue as well as an unpleaded issue does not give fair notice to the opposing party that the unpleaded issue is entering the case); *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir.1982) ("When the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no indication that the party presenting the evidence intended thereby to raise a new issue, amendment may be denied in the discretion of the trial court.") (citations omitted). Accordingly, the court finds that CFC did not consent to the London Insurers' claim that, as of February 9, 2000, IBIS was not aware of the October terminations, because CFC was not aware that the London Insurers would take a position that was contrary to an allegation affirmatively pled in their Complaint until the London Insurers filed their trial brief, which was after the close of discovery and after the parties had agreed to submit this matter to the court on the written record in lieu of a bench trial. *See In Re Rivinius, Inc.*, 977 F.2d 1171, 1176 (7th Cir.1992) (stating that appellant did not consent to appellee's assertion of the contribution claim because it was not aware that appellee would raise a contribution theory until appellee filed its post-trial brief after the bankruptcy court bench trial).

■■■ Even assuming that CFC impliedly consented to the amendment of the London Insurers' Complaint, "an implied amendment of the pleadings will not be permitted where it results in substantial prejudice to a party, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory." *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir.1992) (internal quotations and citations omitted); *see also Matter of Prescott*, 805 F.2d 719, 725 (7th Cir.1986) ("The test for such consent is whether the opposing party had a fair opportunity to

defend and whether he could have presented additional evidence had he known sooner the substance of the amendment."); *Cioffe v. Morris*, 676 F.2d 539, 542 (11th Cir.1982) (explaining that implied consent under Rule 15(b) will not be found if the defendant will be prejudiced; that is, if the defendant had no notice of the new issue, if the defendant could have offered additional evidence in defense, or if the defendant in some other way was denied a fair opportunity to defend) (citations omitted). The court finds that CFC would be prejudiced if the London Insurers are granted leave to amend their Complaint. This is so, because the court finds that the London Insurers were clearly aware of the fact that CFC relied on the factual allegation that IBIS was aware of the October terminations as of February 9, 2000. For example, on December 20, 2000, CFC's counsel expressly noted the London Insurers' position that IBIS was informed of the terminations at issue during Sue Shrum's deposition. Shrum Dep. at p. 137 (App.35). Thereafter, on December 28, 2000, the London Insurers' investigator, Richard Schwartz, testified that he continued to believe that Mr. Richards knew of the terminations because Mr. Richards told him so. Schwartz Dep. at 169 (App.470). Despite knowing that CFC relied on the factual allegation that IBIS was aware of the October terminations and despite knowing that CFC asked questions to witnesses based on this allegation, the London Insurers did not amend their Complaint to notify CFC that they were disputing an allegation that they had affirmatively pled. While the London Insurers may contend that it was not until Ken Richards's testimony on December 22, 2000, that they learned that the allegation contained in paragraph 29 of their Complaint was inaccurate, the London Insurers, nonetheless, inexplicably waited until March 5, 2001, to amend their Complaint.

Additionally, CFC clearly relied on this factual allegation in its trial brief, referencing paragraph 29 of the London Insurers' Complaint at least seven times. The court is also persuaded by CFC's argument that it would have conducted the deposition of Ken Richards differently had it known that the London Insurers planned on attempting to reverse their position regarding IBIS's knowledge of the terminations. CFC claims that, rather than strenuously cross-examining Mr. Richards regarding his testimony that although he knew the employees at issue were gone, and that there had been a "change in the management," he did not recall hearing the words "involuntarily terminated" or "fired," see Richards Dep. at p. 30 (App.297), CFC asked limited questions and elected not to introduce evidence relevant to his credibility. CFC pursued this strategy because CFC relied on the fact that IBIS's knowledge of the terminations was affirmatively pled and undisputed. Thus, the court finds that CFC did, in fact, rely on the factual allegation that IBIS was aware of the October terminations and that to allow the London Insurers to amend their Complaint this late in the game would prejudice CFC.

Furthermore, because the London Insurers' motion to amend is made pursuant to Rule 15(b), presumably they are moving to amend their Complaint so that it conforms to the evidence. Upon review of the evidence, however, the court is not so convinced that if the Complaint were, indeed, amended it would conform to the evidence. The London Insurers base their motion on the testimony of Ken Richards, a non-party in this case, that IBIS was not aware of the involuntary terminations. Notably, however, the London Insurers completely

fail to address the fact that Ken Richards's testimony is in direct contravention to the testimony of their own witness, Richard Schwartz. Indeed, Mr. Schwartz supervised and investigated this litigation on behalf of the London Insurers, and he unambiguously stated that IBIS was aware of the terminations. Significantly, Mr. Schwartz "carefully" reviewed the Complaint after it was drafted to ensure its accuracy, see Schwartz Dep. at p. 165 (App.469), and stood behind the accuracy of the Complaint, including paragraph 29, during his deposition, which was subsequent to Ken Richards's deposition. Remarkably, the London Insurers never address the contradictory testimony between Mr. Schwartz and Ken Richards, yet they ask this court to allow them to amend their Complaint, after discovery and briefing in this case is closed, ostensibly so that the Complaint may conform to the evidence. The court is troubled by the fact that the London Insurers have moved pursuant to Rule 15(b), but have failed to even explain why the court should allow them to amend their Complaint based on the testimony of a non-party, which is directly at odds with the testimony of their own witness. The court notes that it may consider whether a party seeks leave to amend in bad faith or with a dilatory motive. Under Fed. R.Civ.P. 11, a party may not interpose an amendment to its pleadings solely for delay. Likewise, a party cannot seek to amend claims that it cannot in good faith support. In re Circuit Breaker Litig., 175 F.R.D. 547, 551 (C.D.Cal.1997). Here, the court will not go so far as to conclude that the London Insurers have filed their motion to amend their Complaint in bad faith, however, the court is reluctant to allow the London Insurers to amend a fact that they affirmatively pled[3] and have maintained

---

3. Additionally, in its brief in support of its September 9, 2000, motion for summary judgment, CFC specifically mentioned the fact

that IBIS was aware of the October terminations as of February 9, 2000. In their resistance to CFC's motion for summary judg-

from July 24, 2000, to March 5, 2001, based on the testimony of Ken Richards, which, as noted previously, is in direct contravention to the testimony of their own witness, Mr. Schwartz. Nonetheless, as indicated previously, the court refuses to grant the London Insurers leave to amend because the court concludes that Rule 15(b) is not applicable here. Even assuming that Rule 15(b) was applicable here—that is, CFC either impliedly or explicitly consented to the amendment of the London Insurers' Complaint—the court concludes that such an amendment after the close of discovery and after this case has been submitted to the court, by stipulation of the parties, would undoubtedly result in substantial prejudice to CFC.

### 3. Rule 15(a)

■ While the London Insurers have made their motion to amend pursuant only to Rule 15(b), both parties have briefed the underlying principles of amendment not only under Rule 15(b), but also, by implication, under Rule 15(a) of the Federal Rules of Civil Procedure. Rule 15(a) of the Federal Rules of Civil Procedure states, with emphasis added:

> Amendments. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served, or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. *Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.* A party shall plead in re-

sponse to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be longer, unless the court otherwise orders.

FED.R.CIV.P. 15(a). In *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the seminal case concerning Federal Rule of Civil Procedure 15(a), the Supreme Court declared that, although leave to amend under Rule 15(a) is committed to the sound discretion of the district court, it should be routinely granted under Rule 15(a) absent a reason such as: (1) undue delay; (2) bad faith or dilatory motive; (3) continued failure to cure deficiencies by prior amendments; (4) undue prejudice to the opposition; or (5) futility of amendment. *Id.* at 182, 83 S.Ct. 227; *see also Sanders v. Clemco Indus.,* 823 F.2d 214, 216 (8th Cir.1987).

The court has already discussed two of these reasons with respect to the London Insurers' Motion to Amend their Complaint pursuant to Rule 15(b), namely, undue prejudice to CFC and bad faith or dilatory motive. For the same reasons set forth above, the court would refuse to allow the London Insurers leave to amend their Complaint pursuant to Rule 15(a), because of the prejudice that would result to CFC. Additionally, the court also concludes that it would refuse to allow the London Insurers leave to amend because of undue delay and futility of amendment, both of which will be discussed in turn.

First, with respect to undue delay, the London Insurers fail to set forth a reason as to why they are seeking to amend their Complaint now that briefing and discovery are closed in this case. Rather, the Lon-

---

ment, the London Insurers also mention that IBIS was aware of the October terminations as of February 9, 2000. Even this court, in its ruling on CFC's motion for summary judg-

ment, indicated in the factual background discussion that IBIS was aware of the October terminations as of February 9, 2000.

don Insurers simply offer the following reason: "These allegations were made upon information and belief before discovery in this instant action was conducted and before the facts underlying this dispute were fully known." This reason, however, does not shed any light on why the London Insurers waited until March 5, 2001, to move to have their Complaint amended. Indeed, the London Insurers deposed Ken Richards on December 22, 2000. Therefore, they were privy to Ken Richards's testimony for nearly two and a half months, yet waited until the discovery and briefing were closed in this case to seek amendment of a factual ground upon which their fraud claim is based without any rationalization for their delay. Without any proper justification, the court finds such delay inexcusable. *See Nat'l Liberty Corp. v. Wal–Mart Stores, Inc.,* 120 F.3d 913, 917 (8th Cir.1997) (denying motion to amend complaint to inject new fact allegation into case where motion was first made after discovery closed and trial was approaching); *Missouri Hous. Dev. Comm'n,* 919 F.2d at 1316 (explaining that amendment "clearly will not be allowed when the moving party has been guilty of delay in requesting leave to amend and, as a result of the delay, the proposed amendment, if admitted, would have the effect of prejudicing the other party to the action"); *Thompson–El v. Jones,* 876 F.2d 66, 67–68 (8th Cir.1989) (affirming denial of leave to amend where motion was filed after discovery was completed two weeks before trial); *Moldea v. New York Times Co.,* 793 F.Supp. 338 (D.D.C.1992) (stating that "[i]t is settled that where a defendant has filed a dispositive motion ... and plaintiff has opposed it, denial of permission to amend is proper."). Second, the court finds that allowing the London Insurers leave to amend their Complaint would be futile,

because, as will be demonstrated more thoroughly below, the weight of the evidence shows that as of February 9, 2000, IBIS was, indeed, "well aware" of the October terminations. Therefore, the London Insurers' Motion to Amend Complaint to Conform to Evidence is **denied**. Additionally, the court **denies** as **moot** CFC's Motion to Strike the London Insurers' Reply in Further Support of Motion to Amend. Having ruled upon these preliminary motions, the court now turns to the merits of this case.

### B. Findings of Fact

### The London Insurers and their relationship with U.S. Risk

The London Insures are non-admitted insurers in the "surplus lines" market.[4] U.S. Risk was the London Insurers managing general agent and it possessed underwriting authority for the London Insurers here in the United States. Indeed, it was U.S. Risk, without any input from the London Insurers, that decided to insure the risks at issue in this litigation.

### IBIS's Relationship with U.S. Risk

In 1994, IBIS signed a contract with U.S. Risk. IBIS is a retail insurance brokerage that specializes in providing the banks in the State of Iowa, which are members of the Iowa Bankers Association, with insurance coverage to meet their specific needs. IBIS was the only Iowa licensed agent/broker associated with U.S. Risk. Therefore, when the London Insurers sold a policy in Iowa, any Iowa applications had to be processed through IBIS and only IBIS, because U.S. Risk was not licensed in Iowa, could contact the insured. The contract between IBIS and U.S. Risk specifically provided that IBIS had only a brokerage relationship with U.S. Risk, and

---

**4.** The surplus lines market is a market of last resort, that is a market which is called upon

to underwrite those risks which licensed insurers have refused to write.

that IBIS would, at all times, be the sole representative and agent of the insured.

For some period of time, IBIS had extensive contact with U.S. Risk, so much so that U.S. Risk's underwriter, Sue Shrum, described the contact as "constant." Specifically, Ms. Shrum described U.S. Risk's business relationship with IBIS as follows:

Q. Ms. Shrum, I want to make sure I understand how all of this works in Iowa. IBIS is the only producer in Iowa; correct?

A. Yes.

Q. IBIS procures the application for insurance; correct?

A. Yes.

Q. IBIS sends completed applications to U.S. Risk; correct?

A. Yes.

Q. U.S. Risk sends a quote directly to IBIS; correct?

A. Yes.

Q. And it's IBIS that provides that quote to the insured; correct?

A. As far as I know.

Q. And IBIS collects premiums for policies sold through U.S. Risk in Iowa; correct?

A. Yes.

　　*　　*　　*　　*　　*　　*

Q. And U.S. Risk sends the actual insured's policy to IBIS; is that correct?

A. Yes.

Q. And it's IBIS that sends the actual policy to the insured; correct?

A. From what I understand.

Q. In fact, in Iowa it's only IBIS that has direct contact with the insured regarding a policy or application; correct?

A. I assume, yes.

Q. Does U.S. Risk have the right to demand information from IBIS with regard to policies?

A. Yes.

Shrum Dep. at p. 61–63 (App.16–17). Moreover, it was revealed that U.S. Risk supplies IBIS with blank insurance application forms to be completed. Additionally, IBIS and U.S. Risk agree on the payment to IBIS for each policy IBIS sells, without any involvement by the insured. U.S. Risk has a 25% commission rate with the London Insurers. When IBIS sells a policy, U.S. Risk splits its commission with IBIS so that IBIS gets a 17.5% commission and U.S. Risk retains 7.5%. The London Insurers pay the commission; the insured does not. IBIS was one of U.S. Risk's top producers, having produced over one and a half million dollars in premium for U.S. Risk from 1998–1999. IBIS, however, had no authority to bind coverage, change coverage or take any action without U.S. Risk's prior authorization.

### Relationship between CFC, IBIS and U.S. Risk

Prior to October of 1999, CFC bank principals John and Tim Brown had significant involvement in the procurement of insurance for their banks. They had applied for employment practices liability ("EPL") insurance for a number of years, utilizing the services of IBIS, their insurance broker. In fact, IBIS employee Ken Richards had been working with John and Tim Brown for at least ten years. During that time, Mr. Richards provided recommendations regarding insurance to CFC, however, CFC always made the final decision as to which policies it would purchase. Moreover, CFC operated its own in-house agency, whereby it sold insurance to banking customers and to CFC itself. Deb Baschke, a licensed insurance agent, was employed by CFC and acted as CFC's insurance manager. Among other duties, Ms. Baschke was required to ensure that CFC and its subsidiary banks had the required policies that they needed for coverage, and that the policies were correct. Ms. Baschke had assisted CFC in filling

out the application for the U.S. Risk policy that was in effect from 1997–1998.

### U.S. Risk's Prior Insurance Policies with CFC

Prior to 1999, U.S. Risk had previously underwritten EPL liability policies for CFC since 1997. As part of that process, CFC president Tim Brown had signed several previous applications, which made clear the importance of the information on the application to the underwriting process. Tim Brown, however, indicated that he only read the declaration pages of the policies and did not read the remainder of the contents of the various policies. Included in these previous EPL policies issued by U.S. Risk to CFC was a provision entitled "Representations," which made clear to the policyholder that all information requested in the application would be deemed material to the risk, and that failure to convey such information could result in the voiding of coverage. Additionally, those policies also contained a provision entitled "Changes," which specifically stated that "knowledge possessed by any agent or any other person shall not affect a waiver or change in any part of this Policy or stop the insurers from asserting any right under the terms of this Policy."

### CFC Acquires the Stock of First Security Banshares

On August 5, 1999, U.S. Risk sent IBIS a letter informing IBIS that CFC's insurance was expiring and that U.S. Risk would like to keep this policy in place. Around the time that CFC's insurance renewal was approaching, CFC was in the process of purchasing First Security Banshares's stock. First Security Banshares was a holding company for a small bank called Security State Bank ("SSB"). Both U.S. Risk and IBIS knew about CFC's acquisition of SSB. After the acquisition of SSB, on or about October 7, 1999, John Brown fired three employees, including Kevin Kuehl, a physically handicapped bank officer, Karen Rehms, a SSB bank officer, and Paul Albrecht, SSB's president. A fourth employee, Marvin Kuehl, resigned. John Brown, as the new owner and president, assumed all of these jobs.

### IBIS Procures CFC's Application

On October 13, 1999, IBIS employee Ken Richards traveled to Northwest Iowa to procure a new insurance application from CFC. Ken Richards took U.S. Risk's blank application form with him and met with Tim Brown, John Brown and Randy Johnson to procure CFC's insurance application. During this meeting, Ken Richards read the questions in U.S. Risk's application to Tim Brown, John Brown and Randy Johnson and completed the form, which entailed actually writing the answers in the form. During this October 13, 1999, visit, Ken Richards was informed of the firings at SSB.[5] However, Ken Richards explained to Tim Brown, John Brown and Randy Johnson that the firings at SSB were irrelevant because the renewal application was being completed for CFC, not SSB.

Moreover, on the day that Ken Richards visited SSB and spoke with Tim Brown, John Brown and Randy Johnson, SSB completed a form for IBIS canceling insurance for three of SSB's former employees, namely, Marvin Kuehl, Kevin Kuehl and Karen Rehms. Although SSB noted next to each of these three names "termination of employment," only Kevin Kuehl and Karen Rehms had been fired, whereas Marvin Kuehl had resigned. Thereafter, SSB completed a similar form for Paul Albrecht, who had been fired, and submitted it to IBIS. On January 26, 2000, SSB submitted to IBIS a current form listing all of its directors and officers.

---

**5.** This finding of fact will be flushed out in further detail below.

On October 13, 1999, the only insurance sought was for CFC, and two of its subsidiaries, Central Trust and Commercial Trust. At that time, no insurance was sought for SSB. Thus, every answer in CFC's October 13, 1999, renewal application was accurate as to CFC, Commercial Trust and Central Trust. After receiving the renewal application, Ms. Shrum responded to IBIS with the following: "per your request, we will renew this policy based on information received. If any changes, please advise promptly. Binder and invoice will follow shortly." *See* Exhibit J (Vol. I App. 178).

### U.S. Risk issues a Binder and Insurance

On November 10, 1999, U.S. Risk sent IBIS an insurance binder regarding CFC's October 13, 1999, application, which stated the following:

- This renewal proposal is based on the 33 employees employed with Commercial Trust & Savings, Central Trust & Savings, and Commercial Financial Corporation.
- It appears that the employees from First Security Banshares, Security State Bank of Milford, and Security State Bank are not included in the total number of 33 employees.
- If the employees need to be added to the policy, we will need employee count and confirmation that the new subsidiaries will follow the same procedures of the parent.

Exhibit 7 (App. Vol. I at p. 94). This binder was sent to IBIS's Connie Hansen.

At the same time that Ken Richards renewed CFC's coverage with U.S. Risk, he intended to obtain a single policy of coverage for SSB and CFC through Executive Risk. However, after renewing CFC's policy with U.S. Risk, it was learned that Executive Risk declined to issue coverage to SSB broader than its existing coverage. IBIS and U.S. Risk were knowledgeable of Executive Risk's refusal to grant coverage to SSB, primarily because IBIS copied U.S. Risk on its communications with Executive Risk. In February of 2000, Deb Baschke noticed that no policy was issued for SSB, and contacted Mr. Richards about the fact that SSB had no policy in effect. After being notified of this fact, Ken Richards told his assistant, Connie Hansen, to contact U.S. Risk to add SSB to CFC's U.S. Risk Policy. Ms. Hansen complied with Richards's request.

### The February 9, 2000, Request to Add SSB to the U.S. Risk EPL Policy

Specifically, Ms. Hansen reviewed U.S. Risk's insurance binder dated November 10, 1999. Ms. Hansen noted that U.S. Risk had told her that, if SSB was to be added to CFC's policy, U.S. Risk needed to know the number of SSB employees and whether SSB followed the same procedure as CFC. On February 9, 2000, Ms. Hansen sent an e-mail to Sue Shrum asking that SSB be added to CFC's policy. Relying on the contents of U.S. Risk's November 10, 1999, binder, Ms. Hansen identified the number of SSB employees and confirmed that SSB followed the same procedures as CFC. In so doing, Ms. Hansen provided the information that was specified in the binder if SSB was going to be added to CFC's already existing policy. Sue Shrum did not ask Ms. Hansen any additional questions. Ms. Hansen relied on the fact that Sue Shrum was an experienced underwriter and that if additional information was needed, Sue Shrum would have asked. Sue Shrum, however, testified that Ms. Hansen should have known that U.S. Risk would want to know about SSB terminations, and she suggested that she might not ask such information because it is so basic that she would worry about offending an experienced agent when requesting it.

In the February 9, 2000, e-mail that Ms. Hansen sent to Sue Shrum, Ms. Hansen specifically asked if further information was required to issue coverage for SSB. Ms. Shrum never responded to this e-mail. Thereafter, on February 17, 2000, Ms. Hansen sent another e-mail to Ms. Shrum and asked her again if she needed any further information. Ms. Shrum sought nothing further, and U.S. Risk issued coverage for SSB. Ms. Shrum confirms that, when U.S. Risk issued insurance for SSB, she knew that CFC's October 13, 1999, application contained no information pertaining to SSB. Ms. Shrum also confirmed that U.S. Risk knew that it received only the following two pieces of information pertaining to SSB: that SSB had 13 employees and that SSB followed the same procedures as CFC. U.S. Risk proceeded to cover the risk, and accordingly, SSB, having paid for that coverage, believed that it had insurance.

### The London Insurers' Investigation

Soon thereafter, the three terminated SSB employees sued SSB. After a notice of claims was filed, the London Insurers requested Richard Schwartz at Professional Claims Managers to investigate whether or not they should provide coverage for the underlying claims. Mr. Schwartz conducted an investigation and recommended that the London Insurers pursue one of the following two courses of action: (1) rescind coverage for material misrepresentation and return the premium; or (2) accept coverage for these claims, but charge the insured an additional premium for the time period from October 6, 1999, through February 9, 2000. On June 9, 2000, the London Insurers cancelled CFC's and SSB's insurance coverage. Four days later, on June 13, 2000, the London Insurers, through Mr. Schwartz, informed the insureds of the cancellation. On July 24, 2000, the London Insurers sued CFC for rescission of the contract on the basis of fraud.

## II. LEGAL ANALYSIS

### (including some further findings of fact)

The London Insurers contend that the concealment of material information concerning the terminations during the process of requesting that SSB be added as an insured under CFC's EPL policy in February of 2000 constitutes fraud. As such, the London Insurers contend that they are entitled to equitable rescission of that EPL policy. In their trial brief, the London Insurers specifically assert the following reasons in support of their contention that they are entitled to recission: (1) There is no question that the undisclosed terminations were material to the underwriting of employment practices liability coverage for SSB; (2) there was, in fact, inequality of knowledge between the banks and the London Insurers with respect to the material, undisclosed October terminations, giving rise to a duty, on the part of the banks, to disclose this information; (3) the banks did not disclose the terminations to U.S. Risk; (4) proof of the bank's failure to communicate the undisclosed terminations, as material information, satisfies the London Insurers' duty to prove the elements necessary to prevail on its claim of fraudulent misrepresentation.

CFC, however, contends that the London Insurers' rescission claim based on fraud is barred because the London Insurers' "soliciting agent" knew of the October terminations that were allegedly concealed from the London Insurers. CFC relies on IOWA CODE § 515.123, arguing that IBIS is the London Insurers' "soliciting agent," and because IBIS knew of the October terminations, IBIS's knowledge is imputed to the London Insurers. CFC also contends that the London Insurers' claim is barred by IOWA CODE § 515.81A(2)(b). Additionally, CFC contends that the London Insurers fail to meet their burden in prov-

ing the elements of their fraud claim. Lastly, CFC asserts that even if the London Insurers could establish entitlement to recission, they should be estopped from exercising that right. Having outlined the arguments raised by each of the parties, the court turns to these arguments.

### A. IBIS's Role

The court finds that the crux of this litigation turns on the role that IBIS played in the insurance transaction between CFC and U.S. Risk. Indeed, the court finds this issue to be dispositive. CFC asserts that IBIS is the London Insurers' "soliciting agent" as that term is defined in Iowa Code § 515.123. Conversely, the London Insurers assert that IBIS is not their "soliciting agent," but is CFC's agent. In the alternative, the London Insurers contend that the section of the Iowa Code upon which CFC relies in support of its argument that IBIS is the London Insurers' "soliciting agent" is not applicable to them, because it does not govern relationships between surplus-line producers (IBIS) and non-admitted insurers (the London Insurers). Therefore, the court must first determine whether IBIS, an individual insurance producer, is a broker or a "soliciting agent" for the London Insurers.[6] Then, if the court concludes that IBIS is, in fact, acting as the London Insurers' "soliciting agent," the court will proceed to determine the applicability of Iowa Code § 515.123 to the insurance transaction at issue in this case, and its effect, if any. If, on the other hand, the court concludes that IBIS is not the London Insurers' "soliciting agent," then the court will proceed to determine whether the London Insurers have satisfied their burden in sustaining their fraud claim, and address the other defenses raised by CFC.

**6.** Because this case is before the court based on diversity jurisdiction, it is controlled by Iowa law. *First Bank of Marietta v. Hogge,*

### 1. What is a "soliciting agent" under Iowa law?

The definition of a "soliciting agent" in Iowa is outlined in Iowa Code § 515.123, which provides as follows:

Any person who shall hereafter solicit insurance or procure application therefor shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application or on a renewal thereof, anything in the application, policy, or contract to the contrary notwithstanding.

The Eighth Circuit Court of Appeals has explained that "[u]nder Iowa law ... any person soliciting insurance or procuring an application thereof shall be held to be the soliciting agent of the insurance company." *Imperial Cas. & Indem. Co. v. Carolina Cas. Ins. Co.,* 402 F.2d 41, 44–45 (8th Cir.1968); *see also Hartman & Daniels v. Hollowell,* 126 Iowa 643, 102 N.W. 524, 524 (Iowa 1905) (holding that one who requested a property owner to permit him to secure a fire policy on the property through a foreign insurance agency, and who did so, was a soliciting agent).

As CFC thoroughly noted in its trial brief, Iowa Code § 515.123 was codified in the nineteenth century. At that time, both the Iowa Supreme Court and the United States Supreme Court had occasion to comment upon the purpose of Iowa Code § 515.123. In *St. Paul F. & M. Ins. Co. v. Shaver,* 76 Iowa 282, 41 N.W. 19 (Iowa 1888), the Iowa Supreme Court explained as follows:

It is provided by our statute that "any person who shall hereafter solicit insurance or procure applications thereof shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application, or a

161 F.3d 506, 510 (8th Cir.1998); *Frideres v. Schiltz,* 113 F.3d 897, 898 (8th Cir.1997).

renewal thereof, anything in the application or policy on to the contrary notwithstanding." This provision is, we think, conclusive of the question under consideration. The transaction was simply an application by defendants for insurance on their property, and the issuance by plaintiff of its policy thereon, and the business was transacted through Giberson. The purpose of the statute was to settle, as between the parties to the contract of insurance, the relation of the agents through whom the negotiations were conducted. Many insurance companies provided in their applications and policies that the agent by whom the application was procured would be regarded as the agent of the insured. Under that provision, they were able to avail themselves, in many cases of loss, of defenses which would not have been available if the solicitor had been regarded as their agent, and many cases of hardship and injustice arose under its enforcement, and that is the evil which was intended to be remedied by the statute, and it ought to be so interpreted as to accomplish that result.

*Id.* at 20. The Iowa Supreme Court additionally clarified that the words "procure" and "solicit," which appear in the statute, are to be construed broadly, stating:

Now, while Giberson did not solicit the insurance in the sense of having importuned defendants to apply for it, he did procure the application within the meaning of the statute; for he received it, and at his request the policy was issued upon it. To hold otherwise would be to put an exceedingly narrow construction upon the words of the enactment and one which in many cases would defeat the manifest legislative intent. The manner in which such business is conducted is known to all men. Prudent business and property owners do not wait to be personally solicited before procuring insurance on their property, but their cus-

tom is to apply to the agent of some company or association engaged in the business of insurance; and, if the agent is a mere solicitor, their application is forwarded to some agent or officer having authority to accept of reject it. The statute was as certainly intended to apply to transactions of that kind as to those in which the agent procured the application by personal solicitation; and that was the character of the transaction in question.

*Id.* at 20; *see also Stillman v. Aetna Life Ins. Co.*, 240 F. 462, 471 (N.D.Iowa 1917). Furthermore, the United States Supreme Court in *Continental Life Ins. Co. v. Chamberlain*, 132 U.S. 304, 10 S.Ct. 87, 33 L.Ed. 341 (1889), stated that the language of Iowa Code § 515.123:

dispenses with an inquiry as to whether the application or the policy, either expressly or by necessary implication, made Boak the agent of the assured in taking such application. By force of the statute, he was the agent of the company in soliciting and procuring the application. He could not, by any act of his, shake off the character of agent for the company. Nor could the company by any provision in the application or policy convert him into an agent of the assured. If it could, then the object of the statute would be defeated. In his capacity as agent of the insurance company, he filled up the application-something that he was not bound to do, but which service, if he chose to render it, was within the scope of his authority as agent.

*Id.* at 310–11, 10 S.Ct. 87; *see also Stillman*, 240 F. at 471.

The Iowa Supreme Court has also made clear that it is irrelevant for purposes of Iowa Code § 515.123 whether an agent is licensed by, or even known to, the insurer, explaining:

Counsel insist that this statute cannot be construed as contemplating a person who wrongfully obtains a blank application, and, without knowledge of the company, solicits insurance, fills up the blanks in the application, and procures it to be signed by a person desiring insurance. Clearly not, if this is all that is done. But suppose the application, so filled up and signed, is presented to the company, and it issues a policy thereon, and receives the premium. Is it not bound thereby, even if it does not know who procured the application? We think a policy so issued would be a valid contract of insurance. If material, the company was bound to know who the agent was, and, without doubt, could be compelled to pay the loss if one occurred. The statute should be considered, we think, as embracing any case where such a policy has been issued upon an application; and whoever procures such application must be regarded as the soliciting agent of the company issuing the policy.

*Bennett v. Council Bluffs Ins. Co.*, 70 Iowa 600, 31 N.W. 948, 949 (Iowa 1887). Having examined case-law explaining the term "soliciting agent," the court must determine whether the conduct of IBIS renders IBIS the London Insurers' "soliciting agent." As the London Insurers accurately point out, such a relationship cannot be presumed; rather, this determination entails a fact-specific inquiry.

### 2. Is IBIS a "soliciting agent"?

The relationship between IBIS and U.S. Risk is outlined in detail in the foregoing Findings of Fact section of this opinion. For purposes here, however, the court finds it relevant to reiterate that U.S. Risk, through its underwriter, Sue Shrum, unambiguously stated and confirmed that it relied on IBIS to procure information in the insured's application:

Q. Who did procure the application from Commercial Financial Corp.?

A. IBIS.

Q. And did U.S. Risk rely on IBIS to get that application completed?

A. Yes sir.

Q. And did U.S. Risk rely on IBIS to provide that information to U.S. Risk?

A. Yes sir.

Shrum Dep. at p. 69, 31 N.W. 948 (App.18)

Q. You didn't solicit it; correct?

A. No.

Q. It was IBIS that solicited that application.

A. That's correct.

Shrum Dep. at p. 64, 31 N.W. 948 (App.17). Throughout Ms. Shrum's deposition testimony, she made it crystal clear that U.S. Risk never interacted with the insured; rather U.S. Risk relied on their producers, which in this case was IBIS, to solicit the insurance policies to the insured. She also testified that IBIS accepted premium payments for the insured's policy and was paid by the London Insurers for procuring the application. Despite this testimony, Ms. Shrum and Mr. Schwartz testified that IBIS was not the London Insurers' agent. Moreover, they both testified that IBIS did not have authority to bind coverage, change coverage or take any action without U.S. Risk's prior authorization. As the London Insurers correctly point out, whether IBIS was the London Insurers' soliciting agent requires the court to focus on the nature of IBIS's conduct.

■ Initially, with respect to CFC's October 13, 1999, renewal application, U.S. Risk sent the blank application form to IBIS. IBIS then contacted CFC regarding renewing its policy. Ken Richards, IBIS's employee, traveled to Hartley, Iowa, where SSB was located and where Tim Brown, John Brown and Randy Johnson were stationed for the day. IBIS, via

Richards, read the questions on the blank renewal application, which was provided to IBIS from U.S. Risk, and wrote in the answers that were provided by the Browns and Randy Johnson. IBIS completed the application and had John Brown sign it for approval. IBIS then sent the application to U.S. Risk, and U.S. Risk sent a quote to IBIS. IBIS then provided the quote to CFC, CFC accepted and paid its premium to IBIS and understood that it was covered. U.S. Risk never had any contact with CFC. With regard to the request to add coverage for SSB, Deb Baschke called Ken Richards to inform him that there was no policy in place for SSB. After that phone call, the entire transaction to add SSB to CFC's policy was consummated entirely between U.S. Risk and IBIS. Based on the foregoing, the court concludes that IBIS is, indeed, the London Insurers' "soliciting agent," as that term is defined in IOWA CODE § 515.123. *See Southeastern Fidelity Ins. Co. v. Gann,* 340 So.2d 429, 430–33 (Miss.1976) (concluding that an insurance broker, who procured insurance for the insured from nonadmitted insurers, became the agent of the insurers under principles of general agency law when the broker acted on behalf of the insurers in placing the insurance and the insurers "accepted his services by issuing the coverage").

The London Insurers contend that the long standing business relationship between IBIS and CFC makes IBIS CFC's agent. This contention, however, is unavailing. Simply because CFC did business with IBIS for a period of time does not *ipso facto* render IBIS CFC's agent. Rather, it is the conduct between the parties that defines their relationship. As is demonstrated above, the conduct of IBIS clearly makes it the "soliciting agent" of the London Insurers. The only reason for IBIS's involvement with CFC was because CFC was a member of the Iowa Bankers Association. There was no direct evidence

of an agreement between IBIS and CFC, nor was there any circumstantial evidence that IBIS acted for and on the behalf of CFC. In fact, as the London Insurers point out, CFC was sophisticated in handling insurance and CFC, not IBIS, always made the final decision as to which policies to purchase.

Undaunted, the London Insurers point out that IBIS entered into a producer agreement with U.S. Risk, which, as indicated earlier, is the London Insurers' underwriter in the United States. This agreement, the London Insurers argue, makes clear that IBIS and U.S. Risk merely agreed to share in the commissions earned on insurance issued to IBIS clients through U.S. Risk, and that the agreement expressly provided that "[i]n submitting business to U.S. Risk, [IBIS] is Agent for the applicant for insurance and is not acting as an agent, subagent or broker for U.S. Risk." Thus, the London Insurers contend that this clause in their contract with IBIS nullifies IOWA CODE § 515.123 and renders IBIS CFC's agent. This argument, however, was entertained by the Iowa Supreme Court, and was rejected outright. In *St. Paul F & M. Ins. Co.,* the Iowa Supreme Court explained:

> Many insurance companies provided in their applications and policies that the agent by whom the application was procured would be regarded as the agent of the insured. Under that provision, they were able to avail themselves, in many cases of loss, of defenses which would not have been available if the solicitor had been regarded as their agent, and many cases of hardship and injustice arose under its enforcement, and that is the evil which was intended to be remedied by the statute, and it ought to be so interpreted as to accomplish that result.

*St. Paul F & M. Ins. Co.,* 41 N.W. at 20; *see also Stillman,* 240 F. at 468 (stating

that "it is not within the rightful authority of the insurance company to evade the provisions of the statute by a statement in the policy"); IOWA CODE § 515.123 ("Any person who shall hereafter solicit insurance or procure application therefor shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application or on renewal thereof, *anything in the application, policy, or contract to the contrary notwithstanding.*") (emphasis added). Having concluded that IBIS is the London Insurers' soliciting agent, the question thus becomes whether IOWA CODE § 515.123 is applicable to the London Insurers.

### 3. *Applicability of IOWA CODE § 515.123*

The London Insurers argue that IOWA CODE § 515.123 is not applicable to surplus lines placements, such as the policy in dispute here. They contend that it is clear from the plain language of Chapter 515 itself that the statute is intended to govern corporations formed under Iowa law or admitted to do business in the state under Iowa law. As a result, the London Insurers argue that the statute, by its own terms, does not apply to them because they are non-admitted insurers formed under the laws of a foreign jurisdiction.[7] Indeed, they contend that they are not insurance companies formed under Iowa law, nor are they admitted to conduct insurance business in Iowa as "foreign insurers."

They further contend that the issuance of insurance in Iowa by non-admitted insurers is strictly limited by IOWA CODE § 515.147.[8]

Extrapolating from this argument, the London Insurers contend IOWA CODE § 515.123, which governs "soliciting agents," does not apply to them because they are a non-admitted insurance company. The London Insurers argue that the definitions of "agent" set forth in Chapter 515, namely IOWA CODE §§ 515.124 and 515.125, indicate that their application is limited to those companies "complying with the laws of [Iowa]" and "doing business in [Iowa]." The London Insurers recognize that the definition of "soliciting agent" does not itself contain the same explicit limitations, they nonetheless argue that the same constraints should be imputed to IOWA CODE § 515.123 given that all three sections of the code address the same subject matter, namely "agents." Despite these arguments, the court is unwilling to conclude that Chapter 515 of the Iowa Code does not apply to non-admitted insurance companies involved in the surplus line market.

First, to render such a conclusion would be nonsensical. Indeed, the Chapter of the Iowa Code that the London Insurers claim is inapplicable to them is the very Chapter that enables them to issue insurance in Iowa. *See* IOWA CODE § 515.147. Thus, the argument that Chapter 515 of

---

**7.** Remarkably, the court notes that this is the first time that the London Insurers have argued that Chapter 515 of the Iowa Code does not apply to them. In its motion for summary judgment, CFC argued that the London Insurers had failed to comply with IOWA CODE §§ 515.94 and 515.95. In their opposition to this motion, the London Insurers never raised the argument that Chapter 515 of the Iowa Code was inapplicable to them because they were non-admitted insurers in the business of placing surplus-lines insurance. In fact, the London Insurers argued that they had complied with IOWA CODE §§ 515.94 and 515.95.

Recognizing the fact that the London Insurers' failure to raise such an argument in their opposition to CFC's motion for summary judgment that they now raise does not amount to a tacit concession that they are subject to Chapter 515, the court nonetheless finds it worth noting.

**8.** That the issuance of insurance in Iowa by non-admitted insurers is limited by IOWA CODE § 515.147 does not mean that the governance of insurance in Iowa by non-admitted insurers is limited by IOWA CODE § 515.147.

the Iowa Code as a whole is inapplicable to the London Insurers is without merit. Second, the fact that the requirements of "surplus line" carriers are found in one section of the Iowa Code, namely, IOWA CODE § 515.147, does not preclude regulation affecting surplus lines elsewhere in the Iowa Insurance Code.[9] *See Smith v. Underwriters at Lloyd's of London,* 326 Md. 600, 606 A.2d 273, 278 (1992) (stating that although the Insurance Code indicates that the rules relating to surplus lines carriers will be found in certain subtitles of that Code, that indication does not necessarily exclude regulation affecting surplus lines elsewhere in the Insurance Code). Whether IOWA CODE § 515.123 is applicable to the London Insurers, therefore, requires this court to focus on this particular code provision in question rather than on the Chapter as a whole.

▮ The court notes that in examining a statute, it must do so with a certain framework in mind. In determining the meaning of statutes, the Iowa Supreme Court has stated that "our ultimate goal is to ascertain and give effect to the legislature's intent." *Janson v. Fulton,* 162 N.W.2d 438, 442 (Iowa 1968). A court must examine the language used in the statute and the purposes for which it was enacted. *Osborne v. Edison,* 211 N.W.2d 696, 697 (Iowa 1973). Moreover, "[c]ertain rules provide guidance in determining the meaning of a statute. For instance, if the terms of the statute are explicit, the plain meaning of the language will be applied." *Teggatz v. Ringleb,* 610 N.W.2d 527, 530 (Iowa 2000) (citing *State v. Jackson,* 601 N.W.2d 354, 356 (Iowa 1999)); *see also Drahaus v. State,* 584 N.W.2d 270, 274 (Iowa 1998) (when text of statute is plain and its meaning clear, court will not search for meaning beyond express terms of statute or resort to rules of statutory construction); *State v. Hesford,* 242 N.W.2d 256, 258 (Iowa 1976) ("[n]o court, under the guise of judicial construction, may add words of qualification to the statute in question or change its terms."). "In such cases, we will simply give effect to the statute as written." *Teggatz v. Ringleb,* 610 N.W.2d at 530 (citing *Drahaus,* 584 N.W.2d at 274). With this framework in mind, the court turns to the provision of the Iowa Code in question.

▮ IOWA CODE § 515.123 provides: "Soliciting agent" defined:

**9.** There is nothing in IOWA CODE § 515.147 that suggests that the regulation of non-admitted insurance companies is limited to this section of the Iowa Code. IOWA CODE § 515.147 provides:

Business with nonadmitted insurers
This chapter does not prevent a licensed resident or nonresident agent of this state, qualified to write excess and surplus lines insurance, from procuring insurance in certain nonadmitted insurers if such insurance is restricted to the type and kind of insurance authorized by this chapter, excluding insurance authorized under section 515.48, subsection 5, paragraph "a", and the agent makes oath to the commissioner of insurance in the form prescribed by the commissioner that the agent has made diligent effort to place the insurance in authorized insurers and has either exhausted the capacity of all authorized insurers or has been unable to obtain the desired insurance in insurers licensed to transact business in this state. The procuring of a contract of insurance in a nonadmitted insurer makes the insurer liable for, and the agent shall pay, the taxes on the premiums as if the insurer were duly authorized to transact business in the state. A sworn report of all business transacted by agents of this state in nonadmitted insurers shall be made to the commissioner of insurance on or before March 1 of each year for the preceding calendar year, on the form required by the commissioner of insurance. The report shall be accompanied by a remittance to cover the taxes on the premiums. An agent who makes the oath, pays the taxes on the premiums, and files the report has not written such contracts of insurance unlawfully, and is not personally liable for the contracts.

Any person who shall hereafter solicit insurance or procure application therefor shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application or on a renewal thereof, anything in the application, policy, or contract to the contrary notwithstanding.

As conceded by the London Insurers, there is no explicit limitation in the definition of "soliciting agent." Indeed, this provision is broad, referring to "any person" and it does not include any language requiring that such a person act on behalf of an insurance company or association "complying with the laws of [Iowa]" and/or "doing business in [Iowa]." In light of the breadth of this provision, the court finds the London Insurers' argument that this provision is not applicable to them to be untenable. Moreover, even if IOWA CODE § 515.123 were to be read in the context of IOWA CODE § § 515.124 and 515.125, thereby constraining its breadth, the court would nonetheless conclude that these agency provisions are applicable to the London Insurers.

IOWA CODE § 515.124 provides:

Agent-general definition

The term "agent" used in the foregoing sections of this chapter shall include any other person who shall in any manner directly or indirectly transact the insurance business for any insurance company *complying with the laws of this state.*

*Id.* Complying with the laws of this state is defined in IOWA CODE § 515.119, which provides:

Compliance with law

An insurance company organized under the laws of this chapter, or doing business in this state, or any foreign or alien company doing business in this state,

shall conform to the provisions of this chapter and all other laws of this state applicable to the insurance company.

*Id.* The language contained in this section, IOWA CODE § 515.119, is extremely broad and makes clear that Chapter 515 applies to all insurance companies selling insurance in Iowa. The London Insurers contend, however, that there is a difference between non-admitted insurers and admitted insurers. While this is perhaps true, these two sections of the Iowa Code, IOWA CODE § § 515.123 and 515.119, draw no such distinction between admitted versus non-admitted insurers. *See Branson v. Municipal Fire & Police Retirement Sys.,* 591 N.W.2d 193, 197 (Iowa 1999) (explaining that our task in construing statutes is "to look at what the legislature said," not at "what it should or might have said."). Moreover, the court finds that IOWA CODE § 515.119 is clearly applicable to the London Insurers because it pertains to "an insurance company organized under the laws of this chapter, or doing business in this state, or any foreign or alien corporation doing business in this state . . . ." The Iowa Supreme Court has held that when a broker/agent performs additional services such as collecting premiums, deducting commissions, and delivering policies, the foreign insurer for which the broker/agent acts has been held to be "doing business" within the state. *Hartman & Daniels v. Hollowell,* 126 Iowa 643, 102 N.W. 524 (Iowa 1905). In this case, IBIS collected the premium from CFC and transmitted it to U.S. Risk, which in turn submitted it to the London Insurers. Among other things, which are outlined in detail above, IBIS also delivered the policy to CFC in Iowa. Thus, even if IOWA CODE § 515.123 was read in the context of §§ 515.124 and/or 515.125[10], the court would conclude

---

**10.** IOWA CODE § 515.125 provides:
Agent—specific definition
Any officer, agent, or representative of an insurance company doing business in this state who may solicit insurance, procure applications, issue policies, adjust losses, or transact the business generally of such companies, shall be held to be the agent of such

that IOWA CODE § 515.123 is applicable to the London Insurers.

Significantly, moreover, noticeably absent from Chapter 515 is any language indicating that Chapter 515 of the Iowa Code is inapplicable to surplus lines insurance. The court finds that had the legislature wanted to exclude surplus lines insurance from a specific provision of the Iowa Code they would have done so. *See Branson*, 591 N.W.2d at 197 (explaining that our task in construing statutes is "to look at what the legislature said," not at "what it should or might have said."); *Hawkeye Bancorporation v. Iowa College Aid Comm'n*, 360 N.W.2d 798, 802 (Iowa 1985) (stating that it is the prerogative of the legislature to define its statutory language); *Henriksen v. Younglove Constr.*, 540 N.W.2d 254, 259 (Iowa 1995) (noting that when the legislature has defined a statutory term, "[t]he court cannot ... apply a definition it finds more to its liking"). Indeed, this is exactly what the Iowa legislature did, however in IOWA CODE § 507A.4, which pertains to "Unauthorized Insurers." This section specifically states, in relevant part, the following:

> The provisions of this chapter shall not apply to: 1. The lawful transaction of surplus lines insurance as permitted by sections 515.147 to 515.149.

Thus, the London Insurers' argument that it is incomprehensible that the Iowa legislature intended IOWA CODE § 515.123 to govern non-admitted insurers, because surplus lines did not become available until decades after IOWA CODE § 515.123 was enacted, is unavailing. If the Iowa legislature wanted to exempt surplus lines carriers from any part of Chapter 515 of the Iowa Code, it would have done so, as it expressly did in IOWA CODE § 507A.4. *See Branson*, 591 N.W.2d at 197.

The London Insurers also contend that IOWA CODE § 515.123 applies only to agents actually licensed with an insurance company. This argument is without merit. The Iowa Supreme Court has squarely addressed this argument and rejected it. *Shaver*, 41 N.W. at 20–21. Significantly, moreover, the Iowa Supreme Court has made clear that the agent soliciting a policy need not even be known to an insurer for his or her knowledge to bind the company. Rather, the insurer merely needs to accept an application procured by the agent. *See Bennett*, 31 N.W. at 949. Thus, the court finds that IOWA CODE § 515.123 is applicable to the London Insurers.

**4. Effect of the applicability of IOWA CODE § 515.123**

■ The effect of the applicability of IOWA CODE § 515.123 is that, under Iowa law, IBIS's knowledge, as the London Insurers' soliciting agent, is imputed to the London Insurers. *Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 788 (Iowa 1988) "We have said that the knowledge and representations of the soliciting agent are imputed to and binding on the insurer." (citing *Johnson v. United Investors Life Ins. Co.*, 263 N.W.2d 770, 772 (Iowa 1978)). Indeed, "[i]t is a settled rule in this state that an insurance company is chargeable with the knowledge on the part of its soliciting agent." *Cornett v. Farmers' Mut. Fire Ins. Ass'n*, 208 Iowa 450, 224 N.W. 524, 526 (Iowa 1929); *see Imperial Cas. & Indem. Co.*, 402 F.2d at 45 (finding a soliciting agent's knowledge imputed to the insurer to prevent rescission); *Johnson*, 263 N.W.2d at 773–74 (holding that an insurer is charged with its soliciting agent's knowledge); *Wisdom v. Farm*

---

insurance company with authority to transact all business within the scope of the agent's employment, anything in the application, policy, contract, bylaws, or articles of incorporation of such company to the contrary notwithstanding.

*Property Mut. Ins. Ass'n,* 199 Iowa 408, 202 N.W. 4, 6 (Iowa 1925) ("Notice of the facts imparted by appellee to the agent was imputed to appellant and is by reason of that fact binding thereon."); *Bennett,* 31 N.W. at 949 (holding same). The Iowa Supreme Court in *Cornett* further stated:

> If an officer of the insurer, during the course of his employment, acquires any information affecting the risk or becomes cognizant of any breach of a condition precedent or of false or conflicting statements of the insured, his knowledge is imputable to the insurer, and this is true even though he does not in fact communicate his knowledge to the insurer or gives it erroneous information. The rule is applicable not only where the agent is a general one, but also where he is a soliciting agent.

*Id.* at 527. Moreover, an agent's ability to bind coverage on behalf of the insurance company is irrelevant to the imputation of the soliciting agent's knowledge. *See Johnson,* 263 N.W.2d at 772 (explaining that "the question relating to Lutes' authority is not, as alleged by defendant, whether he had authority to waive an exclusion in the insurance policy. Instead it is whether his knowledge and representations in obtaining the application for insurance are binding on defendant for purposes of reformation"); *Johnson v. Farmers' Ins. Co.,* 184 Iowa 630, 168 N.W. 264, 266 (Iowa 1918) ("There is no magic in the mere name 'soliciting agent,' 'recording agent,'[11] or 'general agent.'" Our statute provides that every person who shall in any manner, directly or indirectly, transact business for any insurance company is the agent of such company. The scope and extent of his authority is shown, not merely by reference to his title or to his written commission or credentials, but by the business which he is permitted to do and perform, and does do and perform in the company's name, or by its apparent acquiescence and consent. His act in that behalf is the company's act and his neglect with respect to such business is the company's neglect.); *Smith v. Nat'l Fire Ins. Co.,* 201 Iowa 363, 207 N.W. 334, 335 (Iowa 1926) (explaining that it was not material that soliciting agent was merely a local agent or not a recording agent, because he was the defendant's agent through whom the policy was negotiated); *Wisdom v. Farm Property Mut. Ins. Ass'n,* 199 Iowa 408, 202 N.W. 4, 6 (Iowa 1925) (stating that soliciting agent who was without authority to waive the provisions in the policy was not a factor in whether that agent's knowledge would be imputed).

 Furthermore, "[i]t is well settled that when the misstatements are so made by its agent, their falsity may not be set up by the insurance company to avoid the policy even though it would not have issued the policy had truthful statements been made." *Prudential Ins. Co. of America v. Lawnsdail,* 235 Iowa 125, 15 N.W.2d 880, 883 (Iowa 1944). In fact, the Iowa Supreme Court has explained that even negligence by a soliciting agent in procuring information is to be borne by the insurers, not by the insured. *See Imperial Cas. & Indem. Co.,* 402 F.2d at 44–45; *Johnson v. Farmers' Ins. Co.,* 168 N.W. at 267 (Iowa 1918). Thus, because knowledge of the soliciting agent is imputed to the insurance company under Iowa law, the question in this case is whether as of February 9, 2000, IBIS knew about the October terminations. This question highlights the importance of the factual allegations contained in paragraph 29 of the London Insurers' Complaint, and perhaps why the London Insurers desired to amend their Complaint. For reasons stated earlier in

---

11. A "recording agent" has the power to issue policies, but a "soliciting agent" does not.

this opinion, however, this court will not allow the London Insurers to Amend their Complaint pursuant to Federal Rule of Civil Procedure 15(b). This court also stated that it would be futile to allow the London Insurers to amend their Complaint, because this court found, based on the weight of the evidence, that IBIS was, indeed, aware of these terminations, and set forth this finding in the Findings of Fact section. Recognizing that the court did not explain how it arrived at this factual finding, the court will explain here in detail.

### 5. IBIS's knowledge

■ As indicated previously, the London Insurers alleged from July 24, 2000, to March 5, 2001, that IBIS was "well aware" of the October terminations. Based on Ken Richards's deposition testimony, however, the London Insurers contend that this factual allegation is inaccurate. The London Insurers state that "the unequivocal, repeated and consistent testimony of Ken Richards, IBIS's vice president who handled the CFC and Security State account, is that CFC and Security State failed to ever inform IBIS of the involuntary terminations before Security State was added to CFC's policy." London Insurers' Reply Trial Brief at 27. Additionally, the London Insurers argue that "[i]t is apparent from the testimony of Mr. Richards, the officer of non-party IBIS who took care of CFC and Security State's insurance needs, that CFC and Security State failed to ever inform IBIS of Security State's involuntary terminations before coverage for Security State was procured." *Id.*

The court, however, is not convinced that Ken Richards's testimony establishes by clear and convincing evidence that IBIS did not know of the October terminations as of February 9, 2000. This is so, because the London Insurers' own investigator, Richard Schwartz, repeatedly testified

that Ken Richards told him that he, being Ken Richards, was aware of these terminations. Moreover, the court finds Ken Richards's testimony concerning his knowledge about the October terminations questionable, because Mr. Richards was aware that had he told Mr. Schwartz that he knew of the October terminations, his own actions could result in an errors and omissions claim against him. Thus, although Mr. Richards is a non-party in this case, he nonetheless did have a motive to change his story given the potential errors and omissions claim against him. Additionally, the London Insurers never explain the conflicting testimony that exists between Mr. Richards and their investigator, Mr. Schwartz. The court is troubled by the fact that the London Insurers' own witness has consistently stated that IBIS was aware of the October terminations as of February 9, 2000, based in part on the fact that Ken Richards apparently told him so, yet fail to explain why Mr. Schwartz's testimony is to be discarded in favor of Mr. Richards's testimony. Mr. Richards meets with hundreds of insureds a year and, testified that he could not possibly remember all the details of his many conversations. The following colloquy is insightful:

Q. So if Tim Brown, John Brown and Randy Johnson say, "Gee, you know, we're pretty darn sure we told Ken that we let three employees go," you can say you don't recall that; correct?

A. If I were told in certain kinds of words—

Q. I am just asking for your recollection

A. I wouldn't be able to recall.

\* \* \* \* \* \*

Q. And so you wouldn't say that Tim Brown is a liar if he says that a conversation to that effect occurred; is that right?

A. No.

Q. Because that's human nature that you can't remember every detail of 200 meetings in a single year; correct?

A. That could certainly be possible.

Richards Dep. at 102–03 (App.315).

Therefore, based on Mr. Schwartz's testimony, coupled with the testimony of Tim Brown, John Brown and Randy Johnson, all of whom testified that Ken Richards was told of the terminations at SSB during the October 13, 1999, meeting, the court is convinced that IBIS was, in fact, aware of the terminations. Accordingly, even if the court did allow the London Insurers leave to amend their Complaint and allege that IBIS was not aware of the October terminations based on Ken Richards's testimony, the court would conclude that the London Insurers failed to meet their burden by clear and convincing evidence.

### B. Fraud Claim

Having determined that IBIS's knowledge is imputed to the London Insurers, and that IBIS knew of the October terminations as of February 9, 2000, the court concludes that the London Insurers cannot prove fraud, because they cannot prove the justifiable reliance element of their fraud claim.

Under Iowa law, the elements of an equitable claim for rescission based on misrepresentation are: "(1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance." *Gunderson v. ADM Investor Servs., Inc.*, 85 F.Supp.2d 892, 920 (N.D.Iowa 2000) citing *Hyler v. Garner*, 548 N.W.2d 864, 872 (Iowa 1996); *Utica Mutual Ins. Co. v. Stockdale Agency*, 892 F.Supp. 1179, 1195 (N.D.Iowa 1995). Unlike a claim of fraud-

ulent misrepresentation, "even innocent misrepresentations may be sufficient to support an action for rescission." [12] *Hyler*, 548 N.W.2d at 872. This is so, because in equity, there is no requirement that there be a showing of scienter. *See Hyler v. Garner*, 548 N.W.2d at 871. The plaintiff must prove the elements of fraudulent misrepresentation by clear and convincing evidence. *Wright v. Brooke Group Ltd.*, 114 F.Supp.2d 797, 820 (N.D.Iowa 2000); *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999); *see also Ralfs v. Mowry*, 586 N.W.2d 369, 373 (Iowa 1998) (describing the burden as proving the existence of fraud "by clear, satisfactory, and convincing evidence") (citing *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995)).

In this case, the London Insurers contend that the parties' knowledge regarding SSB's involuntary terminations was unequal. *See Utica Mutual*, 892 F.Supp. at 1195 (stating that "even in an arms-length transaction, a party may rely on an opposing party to disclose matters of which the opposing party has superior knowledge resulting from inequality of condition or knowledge between the parties.") (citations omitted). Additionally, they claim that U.S. Risk's underwriter, Ms. Shrum, relied upon CFC and IBIS to disclose important, material information. In light of the findings above, however, the court finds that the knowledge between the parties was not unequal. Indeed, the court finds that, as of February 9, 2000, IBIS was aware of the October terminations, and because IBIS is the London Insurers' "soliciting agent," such knowledge is imputed to the London Insurers. Therefore, the London Insurers are precluded from prevailing on their fraud claim, because they cannot prove that they didn't know about the

---

12. The elements of a tort claim for misrepresentation are: "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury or damage." *Hyler v. Garner*, 548 N.W.2d 864, 872 (Iowa 1996) (citing *McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995)).

October terminations as of February 9, 2000. Having concluded that the London Insurers cannot prevail on their fraud claim, the court finds it unnecessary to address the remaining defenses asserted by CFC.

### III. CONCLUSION

The court concludes that the London Insurers are not entitled to rescind CFC's employment practices liability policy. This is so, because the court concludes that IBIS is the London Insurers' "soliciting agent" as that term is defined in IOWA CODE § 515.123, and, therefore, IBIS's knowledge is imputed to the London Insurers. Because IBIS was "well aware" of the October terminations as of February 9, 2000, the London Insurers were "well aware" of the October terminations as of February 9, 2000. Consequently, the London Insurers' claim for rescission based on fraud cannot be predicated on the allegation that they were not aware of these terminations because, as the court has found, the London Insurers were aware of these terminations. Therefore, the court concludes that the London Insurers have failed to prove that they are entitled to equitable rescission of the November, 1999, renewal employment practices liability policy. Accordingly, the London Insurers' request that this court enter a declaratory judgment that the November, 1999, renewal of the Subject Policy be rescinded is **denied.**

Furthermore, the court **denies** CFC's renewed motion for summary judgment for the same reasons set forth in this court's November 20, 2000, ruling.

**IT IS SO ORDERED.**